## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **JAMESHIA JORDAN,** | |
| **Plaintiff,** | **Civil Action File No.:** |
| **v.** | **Jury Trial Demanded** |
| **HOMEOWNERS ADVANTAGE, LLC; and ATLANTIC 17TH RESIDENTIAL CONDOMINIUM ASSOCIATION, INC.** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff, Jameshia Jordan, ("Plaintiff" or "Ms. Jordan") brings this lawsuit against Defendants HomeOwners Advantage, LLC ("HOA") and Atlantic 17th Residential Condominium Association, Inc. ("Atlantic 17th") (collectively referred to as "Defendants") seeking relief and damages available under law, based on the following factual allegations and causes of action:

## NATURE OF THE ACTION

1.      This action to correct unlawful employment discrimination and retaliation arises under the Americans with Disabilities Act of 1990 as amended by the ADA Amendments Act of 2008 (collectively referred to as the "ADA"). Defendants discriminated against Plaintiff, in violation of the ADA, by refusing to accommodate her reasonable requests for extended medical leave and the implementation of doctor-ordered minor work restrictions. Next, Defendants terminated Ms. Jones' employment on the basis of her disability, although she was a qualified individual as defined by the ADA. Additionally, Defendants retaliated against Plaintiff by terminating her employment for exercising her rights under the ADA. Lastly, Defendants discriminated against Plaintiff by failing to hire or reinstate her as an employee, although she was a qualified individual as defined by the ADA.

## THE PARTIES

2.      Plaintiff is a citizen of the state of Georgia. During the time of the events alleged in this Complaint, Ms. Jordan worked as a concierge for Defendants.

3.      Defendant HOA is a property management company that manages residential, commercial, and retail properties throughout the southeastern United

States. Defendant HOA is also a domestic limited liability company registered with the Georgia Secretary of State, and its principal office address is 817 West Peachtree St NE, Suite 310, Atlanta, GA 30308.

4.     Atlantic 17th is a condominium association. Atlantic 17th is also a domestic nonprofit corporation registered with the Georgia Secretary of State, and its principal office address is 361 17th St. NW, Atlanta, GA 30363.

5.     12 Midtown Residences ("12 Midtown") is a condominium building governed by Atlantic 17th's condominium association rules. 12 Midtown is located at 361 17th St. NW, Atlanta, GA 30363.

6.     Atlantic 17th hired and employs HOA for various property management services at 12 Midtown, including but not limited to concierge services.

7.     Atlantic 17th and HOA were Plaintiff's joint employers.

8.     Atlantic 17th provides the computer systems and other on-site technology for HOA concierge employees to use in the course of their job.

9.     Atlantic 17th has its own systems, procedures, and protocols as they relate to residents and guests for which HOA concierge employees must be trained.

10.     Plaintiff received her paycheck from HOA.

## **ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED**

11.     Plaintiff filed a Charge of Discrimination, Number 410-2021-05702, against

Defendants with the Equal Employment Opportunity Commission ("EEOC") on March 29,

2021. (See Exhibit No. 1).

12.     On June 27, 2022, the EEOC issued Plaintiff a Determination and

Notice of Rights letter for EEOC Charge Number 410-2021-05702 ("Right to Sue

Letter"). (See Exhibit No. 2).

13.     Plaintiff filed this present civil action within 90 days of receiving her Right

to Sue Letter.

14.     Administrative prerequisites have been met prior to filing this civil

action.

## **JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction concerning this civil action

pursuant to 28 U.S.C.A. §§ 1331 and 1343.

16.    Venue is proper in this district and division under 28 U.S.C.A. § 1391, as Defendants conduct business in, and the alleged unlawful acts occurred in this district and division.

## FACTUAL ALLEGATIONS

### *MS. JORDAN'S HOSPITALIZATION AND DISABILITY ONSET*

17.    In 2017, Ms. Jordan began working as a security officer/concierge at various locations in metro Atlanta through a predecessor employer. Sometime in 2018, she started working as a security officer/concierge at 12 Midtown through her predecessor employer.

18.    In 2020, Atlantic 17th contracted with HOA for property management services at 12 Midtown, at which time Atlantic 17th continued Ms. Jordan's employment as a concierge at 12 Midtown, and she became an employee of HOA and Atlantic 17th as joint employers.

19.    On or about July 3, 2020, Ms. Jordan contracted the coronavirus and developed pneumonia, which resulted in her being hospitalized for approximately ten (10) days (i.e., from July 4 to July 13).

20.     On July 4, Ms. Jordan notified Lead Concierge Colin Baston that she felt unwell and might need to go to an emergency room. Mr. Baston told her to report to work anyway.

21.     Ms. Jordan reported to work, and during her shift, Ms. Jordan's condition worsened, which was noticed by multiple coworkers.

22.     Later, during Ms. Jordan's shift, her coworker Bedford Briar found her slumped over and passed out. Mr. Briar immediately called 911. Ms. Jordan had to be taken by ambulance to the emergency room as she could barely respond or breathe.

23.     Ms. Jordan notified Erica Coles that she was hospitalized. Ms. Coles served as a manager at HOA, Ms. Jordan's immediate supervisor, and an agent of Atlantic 17th.

24.     On or around July 7, Ms. Coles responded to Ms. Jordan via text. Ms. Coles gave Ms. Jordan the contact information for the Director of Human Resources at HOA, Thom Millwood.

25.     On July 9, 2020, Mr. Millwood sent Ms. Jordan a Families First Coronavirus Response Act ("FFCRA") leave request form to fill out while she was in the hospital. He then offered to handle her leave and told Ms. Jordan he did not need anything else from her.

26.     On July 13, 2020, Ms. Jordan was released from the hospital. Per her discharge instructions, she had to use an oxygen tank for many months thereafter due to the debilitating effects of the coronavirus on her lungs.

27.     In the weeks and months following, as a result of contracting the coronavirus and the struggles she faced to fully recover, Ms. Jordan became substantially limited in multiple major life activities; notwithstanding, she remained qualified to perform the essential functions of her position with or without a reasonable accommodation.

28.     Ms. Jordan was on approved, paid FFCRA leave for a twelve (12)-week period between July and September 2020.

*MS. JORDAN'S RECOVERY PERIOD AND CONSTANT COMMUNICATION WITH DEFENDANTS ABOUT HER RETURN TO WORK*

29.    On August 25, 2020, after long waits for COVID-related appointments, Ms. Jordan was able to have her first doctor visit after being discharged from the hospital. She emailed her doctor's note to Lead Concierge Colin Baston.

30.    Between August 25 and September 14, Ms. Jordan had multiple communications via phone, text, and email with Mr. Baston and Ms. Coles, both checking on her progress and asking when her next appointment would be and when did she think she was going to be able to come back to work.

31.    Ms. Jordan's reply to both was that she had to wait on her doctor's official release but that she was doing better as time went by.

32.    On or around September 11, via phone conversation, Mr. Baston told Ms. Jordan that it was agreed upon by him and the office managers (including Ms. Coles) that Ms. Jordan could come back on light duty.

33.    On September 12, Ms. Jordan texted Mr. Baston about her upcoming medical appointment for September 14. She asked if he could send her an email with the light-duty tasks that she could handle upon returning to work. Ms. Jordan planned to inquire with her doctor regarding those light-duty tasks.

34.     On September 14, Mr. Baston sent Ms. Jordan the email outlining various tasks that she could perform upon returning to work.

35.     Defendants were aware that Ms. Jordan was ready to return to work and anticipated being released by her doctor soon. The light-duty work restrictions would not hinder Ms. Jordan from being able to perform her concierge duties.

36.     After her September 14 appointment, Ms. Jordan took her doctor's note to Ms. Coles. The doctor's note indicated that Ms. Jordan was advised to remain off work for 30 days until her next evaluation.

37.     Ms. Jordan and Ms. Coles also discussed the light-duty situation. Ms. Coles then stated that she never agreed to the light-duty terms that Mr. Baston had presented.

38.     Ms. Coles stated that Defendants were unable to provide light duty, even if Ms. Jordan was approved by her doctor to return to work. Ms. Coles scanned the doctor's note, emailed it to Mr. Millwood, and said that she would talk to him and get back to Ms. Jordan.

### DEFENDANTS' FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS AND TERMINATION OF MS. JORDAN'S EMPLOYMENT

39.     On September 17, 2020, Mr. Millwood informed Ms. Jordan by email that "Since you will be out of leave as of 9/24/2020, the additional leave request is treated as an ADA accommodation request under the law." He also stated, "In order to properly process your leave request, we need a note from your doctor with a date by which your doctor estimates you can return. Please resubmit this by next Thursday, September 24, 2020."

40.     On September 18, 2020, Ms. Jordan obtained a new doctor's note that indicated that Ms. Jordan was advised to remain off work for 30 days through October 12, 2020, and that she had a follow-up appointment to be evaluated for her fitness to return to work at that time.

41.     Ms. Jordan personally hand-delivered the note to Ms. Coles, who again scanned it and emailed it to Mr. Millwood. They also discussed Ms. Jordan's progress, and Ms. Jordan stated she was off the oxygen tank. She explained that she could walk without the tank but that she needed it close by in case she felt short of breath. Ms. Jordan asked Ms. Coles if she could bring it to work upon her return,

letting her know it was a small tank, but Ms. Coles said no and that Ms. Jordan had to be "100%."

42.     Ms. Jordan was in communication with Mr. Millwood, Ms. Coles, and Mr. Baston throughout her medical leave concerning her condition and readiness to return to work.

43.     Mr. Millwood had not responded to her September 18 doctor's note, even though he was usually prompt in responding to her in the past.

44.     On September 20, Ms. Jordan also emailed the September 18 doctor's note to Mr. Millwood. Ms. Jordan also reached out to Ms. Coles again.

45.     Sometime between September 20 and September 24, Mr. Millwood called Ms. Jordan about the doctor's note. Ms. Jordan told him about her next appointment and that she was going to try to get the date pushed up. She told Mr. Millwood that she was feeling better and able to return to work. He stated that they would have to go ahead and fill the position. Ms. Jordan told him that Ms. Coles had told her that she had until November 1 before Ms. Coles would have to fill the position. Mr. Millwood stated that Ms. Jordan would have until September 24 but

that he needed a specific date of return. She asked him for more time and was even crying on the call.

46.     Ms. Jordan was shocked. Ms. Coles and Mr. Millwood both knew that Ms. Jordan was already feeling better and wanted to return to work.

47.     However, Defendants did not accommodate Ms. Jordan's request for additional time—a mere two weeks—to attend her final doctor's appointment and obtain clearance from her doctor to return to work.

48.     On September 29, Ms. Jordan spoke with Mr. Millwood by phone. She told him that she had not yet been able to schedule an earlier appointment. She asked him for more time because she was feeling better and ready to return to work. But Mr. Millwood decided to terminate Ms. Jordan's employment because she had not been released yet and because she was not, according to him, "100%." He told her she could come back when she was "100%."

49.     Mr. Millwood sent Ms. Jordan the termination documentation that same day. The paperwork indicated that the termination was effective as of September 29, 2020. The reason for termination provided was "Involuntary – unable to return to work or provide return date."

### DEFENDANTS' FAILURE TO REINSTATE OR HIRE MS. JORDAN BECAUSE OF HER DISABILITY RESTRICTIONS

50.     Ms. Jordan was able to book an earlier appointment with her doctor on October 7 rather than October 12.

51.     Sometime during the first week of October, Ms. Jordan had a phone call with Ms. Coles. Ms. Jordan told her that she got her October 12 doctor appointment pushed up to October 7. Ms. Coles told Ms. Jordan to update her after the appointment.

52.     At her appointment, as anticipated, Ms. Jordan was released to return to work with minor work restrictions.

53.     Immediately after her October 7 appointment, even though she was already terminated, Ms. Jordan went to see Ms. Coles in person at 12 Midtown to ask for her position back.

54.     Ms. Jordan provided her October 7, 2020 doctor's note indicating that she was able to return to work with minor restrictions that did not interfere with her ability to complete her job duties ("strenuous activity, dusty environments, or extremes of temperature").

55.     Ms. Coles stated to Ms. Jordan that she could come back to work with reduced hours starting on October 17 but that Mr. Millwood would have to approve. Ms. Jordan was disappointed that her hours would be cut, but she accepted because she needed her job.

56.     Ms. Coles scanned the doctor's note and emailed it to Mr. Millwood.

57.     On October 16, Ms. Jordan emailed Mr. Millwood to confirm that she could come back to work on October 17 because she did not have confirmation of approval from Ms. Coles or Mr. Millwood.

58.     Mr. Millwood called Ms. Jordan and told her that she would not be reinstated because she was "still not 100%" – referring to her October 7 doctor's note with minor restrictions for her return to work. He also said that he would not hire Ms. Jordan back until she had no restrictions and that she would have to be a new hire, at a different location, at a reduced pay rate.

59.     Ms. Jordan told him that she was able to return to work and that the minor restrictions did not limit her ability to fulfill her job duties. She pled for her job back.

60.     Defendants did not reinstate or hire Ms. Jordan. Defendants did not want to accommodate Ms. Jordan's disability.

61.     On October 19, Ms. Jordan emailed Mr. Millwood, Ms. Coles, and Mr. Baston, clarifying that she was not permitted to return to work by Defendants because of her doctor's note with work restrictions.

62.     On October 20, Ms. Coles responded and confirmed, "Regretfully, we are not able to accept the return to work with restrictions, as we previously discussed earlier in the month." She added, "If you need a letter of recommendation from me or if you plan to try to return once you are 100%, please continue to keep in touch and let me know."

63.     Defendants clearly stated that they did not want to accommodate Ms. Jordan's disability. It was an intentional decision to discriminate and retaliate against Ms. Jordan because of her disability.

## **COUNT I**

### *AGAINST HOA AND ATLANTIC 17TH*
### *ADA DISCRIMINATION (TERMINATION)*

64.     Plaintiff incorporates by reference the preceding paragraphs as though set forth fully and separately herein.

65.     Defendants share or co-determine essential terms and conditions of Plaintiff's employment, which include but are not limited to the following:

(a) the hiring of Ms. Jones

(b) providing Plaintiff with tools, supplies, and equipment to perform her job

(c) setting Plaintiff's work schedule and hours of work

(d) determining Plaintiff's pay rate

(e) determining Plaintiff's benefits

(f) deciding on disciplinary actions

(g) exercising control over the manner and method of Plaintiff's work

(h) supervising Plaintiff's work

66.     Plaintiff's physical impairments are "disabilities" within the meaning of the ADA. Plaintiff has physical impairments that limited one or more major life activities, including but not limited to breathing.

67.     Defendants were aware of Plaintiff's disabilities.

68.     Defendants regarded Plaintiff as having a disability such that she is a person with a disability within the meaning of the ADA.

69.     Plaintiff has a record of having a disability such that she is a person with a disability within the meaning of the ADA.

70.     At all times relevant to this action, Plaintiff was a qualified individual with a known or perceived disability as defined in the ADA.

71.     Defendants terminated Plaintiff's employment because of her disability, perceived disability, or record of having a disability.

72.     Defendants terminated Plaintiff's employment shortly after Plaintiff requested and used medical leave to treat her disability.

73.     By terminating Plaintiff's employment because of her disability, perceived disability, or record of having a disability, Defendants violated the ADA.

74.    Although    Defendants    purport    to    provide    a    legitimate, nondiscriminatory reason for the adverse action, this reason is a pretext for disability discrimination.

75.    Defendants treated other employees outside Plaintiff's protected class differently.

76.    Defendants' actions in subjecting Plaintiff to different terms and conditions of employment constitute unlawful discrimination on the basis of this violation of the ADA.

77.    Defendants have willfully and wantonly disregarded Plaintiff's rights, and Defendants' discrimination against Plaintiff was undertaken in bad faith.

78.    Defendants' termination of Ms. Jordan's employment in violation of the ADA has adversely affected her psychological and physical well-being.

79.    As a result of Defendants' discriminatory actions against Plaintiff, she suffered    lost    compensation    and    benefits,    substantial    emotional    distress, inconvenience, humiliation, mental anguish, and embarrassment.

80.    Defendants discriminated against Plaintiff, and in failing and refusing to take any appropriate remedial action to remedy the unlawful employment practices, Defendant has not only deprived Plaintiff of equal employment opportunities but exhibited malice or reckless indifference to Plaintiff's federally protected rights.

## COUNT II

### *AGAINST HOA AND ATLANTIC 17TH*
### *ADA DISCRIMINATION (FAILURE TO HIRE/REINSTATE)*

81.    Plaintiff incorporates by reference the preceding paragraphs as though set forth fully and separately herein.

82.    Defendants failed to hire or reinstate Plaintiff's employment after she requested reinstatement based on a doctor's release permitting her to return to work with minor restrictions related to her disability.

83    By failing to hire or reinstate Plaintiff's employment because of her disability, perceived disability, or record of having a disability, Defendants violated the ADA.

84. Although Defendants purport to provide a legitimate, nondiscriminatory reason for this adverse action, this reason is a pretext for disability discrimination.

85. Defendants treated other employees outside Plaintiff's protected class differently.

86. Defendants have willfully and wantonly disregarded Plaintiff's rights, and Defendants' discrimination against Plaintiff was undertaken in bad faith.

87. Defendants' failure to hire or reinstate Ms. Jordan's employment in violation of the ADA has adversely affected her psychological and physical well-being.

88. As a result of Defendants' discriminatory actions against Plaintiff, she suffered lost compensation and benefits, substantial emotional distress, inconvenience, humiliation, mental anguish, and embarrassment.

89. Defendants discriminated against Plaintiff, and, in failing and refusing to take any appropriate remedial action to remedy the unlawful employment practices, Defendant has not only deprived Plaintiff of equal employment

opportunities but exhibited malice or reckless indifference to Plaintiff's federally protected rights.

## COUNT III

### *AGAINST HOA AND ATLANTIC 17TH*
### *ADA FAILURE TO ACCOMMODATE*

90.  Plaintiff incorporates by reference the preceding paragraphs as though set forth fully and separately herein.

91.  Upon receiving Plaintiff's requests for accommodation, Defendants failed to engage in any interactive process with Plaintiff regarding her request for reasonable accommodation of her disability.

92.  Defendants refused to provide Plaintiff with reasonable accommodations, even though to do so would not impose an undue hardship.

93.  By refusing to accommodate Plaintiff, Defendants violated the ADA.

94.  Defendants willfully and wantonly disregarded Plaintiff's rights, and Defendants' failure to accommodate Plaintiff's disability was undertaken in bad faith.

95.    The effect of the conduct complained of herein has been to deprive Plaintiff of an equal employment opportunity and has otherwise adversely affected her status as an employee because of her disability.

96.    Defendants' failure to provide a reasonable accommodation to Ms. Jordan, in violation of the ADA, has adversely affected her psychological and physical well-being.

97.    As a result of Defendants' discriminatory actions against Plaintiff, she suffered lost compensation and benefits, substantial emotional distress, inconvenience, humiliation, mental anguish, and embarrassment.

98.    Defendants discriminated against Plaintiff, and, in failing and refusing to take any appropriate remedial action to remedy the unlawful employment practices, Defendant has not only deprived Plaintiff of equal employment opportunities but exhibited malice or reckless indifference to Plaintiff's federally protected rights.

## **COUNT IV**

### *AGAINST HOA AND ATLANTIC 17TH*
### *ADA RETALIATION (TERMINATION)*

99. Plaintiff incorporates by reference the preceding paragraphs as though set forth fully and separately herein.

100.   Plaintiff engaged in protected activity under the ADA by requesting that Defendants accommodate her disability by allowing her to take extended medical leave.

101.   Plaintiff engaged in protected activity under the ADA by requesting that Defendants accommodate her disability by allowing a short extension of time to attend a final scheduled doctor's appointment that would allow her to obtain clearance from her doctor to return to work.

102.   Plaintiff engaged in protected activity under the ADA by requesting that Defendants accommodate her disability by allowing her to return to work with minor restrictions.

103.   Defendants retaliated against Plaintiff by terminating her employment because of her accommodation requests.

104.   Defendants terminated Plaintiff's employment within close temporal proximity to Plaintiff engaging in protected activity.

105.   Defendants' proffered reason for terminating Plaintiff's employment is a pretext designed to hide Defendants' retaliatory motive.

106.   Defendants clearly stated to Plaintiff multiple times that she could not return to work with any restrictions and that she had to be "100%."

107.   Defendants' retaliatory actions against Plaintiff were in violation of the ADA.

## COUNT V

### AGAINST HOA AND ATLANTIC 17TH
### PUNITIVE DAMAGES

108.   Plaintiff incorporates by reference the preceding paragraphs as though set forth fully and separately herein.

109.   Defendants engaged in discriminatory and retaliatory practices, as set forth herein, with malice or with reckless indifference to the federally protected rights of Plaintiff.

110.   Accordingly, Defendants must pay Plaintiff punitive damages pursuant to 42 U.S.C.A. § 1981a(a).

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands a trial by jury and that the following relief be granted:

A.   Back pay and front pay, as well as lost benefits;

B.   Compensatory damages, including but not limited to compensation for her emotional distress, mental anguish, and inconvenience;

C.   Punitive damages based on Defendants' willful, malicious, intentional, and deliberate acts;

D.   Attorneys' fees and costs of litigation;

E.   Prejudgment and post-judgment interest; and

F.   Other relief deemed appropriate by the Court.

Respectfully submitted, this 25th day of September 2022.

**HKM EMPLOYMENT ATTORNEYS LLP**
By: s/ *Jermaine A. Walker*
Jermaine "Jay" A. Walker
Ga. Bar No. 142044
3355 Lenox Road, Suite 705
Atlanta, GA 30326

(telephone) 404-301-4020
(fax, same #) 404-301-4020
jwalker@hkm.com


By: /s/ Sheri Bagheri
Shahrzad "Sheri" Bagheri
Ga. Bar No. 174460
3355 Lenox Road, Suite 705
Atlanta, GA 30326
(telephone) 404-618-3966
(fax) 404-301-4020
sbagheri@hkm.com

**Attorneys for Plaintiff**